NOT DESIGNATED FOR PUBLICATION

No. 129,432

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.S.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Allen District Court; CHARLES H. APT III, magistrate judge. Submitted without oral argument. Opinion filed February 27, 2026. Affirmed.

*Daniel Smith*, of Smith Law Office, LLC, of Chanute, for appellant natural father.

*Brandon D. Cameron*, county attorney, for appellee.

Before ARNOLD-BURGER, P.J., BRUNS and SCHROEDER, JJ.

PER CURIAM:  Prior to terminating a father's parental rights, the district court must find by clear and convincing evidence that the parent is unfit, the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future, and termination of parental rights is in the best interests of the child. K.S.A. 38-2269(a), (g)(1). M.K. (Father), the natural father of J.S., appeals the termination of his parental rights. He challenges the sufficiency of the evidence to support the court's findings that he was presumptively unfit due to the length of time his child had been in out-of-home placement coupled with his failure to carry out a reasonable plan directed toward reintegration of the child. He argues that his incarceration hindered his compliance and the Kansas Department for Children and Families (DCF) service provider failed to adequately inform him of his case plan tasks.

1

We find there was clear and convincing evidence to establish that Father was unfit by reason of conduct or condition which renders him unable to care properly for J.S., that Father's conduct is unlikely to change in the foreseeable future, and it is in J.S.'s best interests that Father's parental rights be terminated. We affirm.

FACTUAL AND PROCEDURAL HISTORY

J.S. first came to the attention of DCF when he was seven months old. Throughout July and August of 2022, DCF received reports alleging lack of supervision of J.S. by Mother, with one incident resulting in J.S. rolling off the bed while Mother was high on methamphetamine. On October 7, 2022, while Mother and J.S. were returning to the safe house where they resided, it was reported J.S. appeared as though he had not been bathed for several days. Mother did not have formula for J.S. and had been giving J.S. cow's milk. The report indicated Mother had been refusing to buy formula or diapers because she needed that money for nicotine or possibly drugs. Mother reported to case workers that when she uses methamphetamines she has left J.S. outside with people she does not know while using. She typically resumes care for J.S. approximately 20 minutes after she uses methamphetamines. Although she complied with many of her case plan tasks, Mother eventually relinquished her parental rights and is not part of this appeal.

On October 12, 2022, the State filed a petition alleging J.S. was a child in need of care. Father was listed on the petition as J.S.'s biological father, and he was notified of the petition. At the time the petition was filed, Father was incarcerated. The district court placed J.S. in the temporary custody of DCF and assigned TFI Family Services (TFI) as the service provider. Father requested that paternity be established before paying child support or completing an action plan. Paternity was established in late April 2023, and Father was notified sometime before May 18, 2023. He was not incarcerated at that time.

2

TFI employee Blaike Debler arranged to meet Father on May 18, 2023, to review his living situation and develop an action plan for reintegration. Father did not show up. When Father did not show up, Debler reached out to Father to inquire whether he was coming to the appointment. At 4:48 p.m., after receiving the message from Debler, Father responded that he had "some things going on right now and today just ain't a good day. I forgot that today was that day." He asked Debler to reschedule.

Monthly attempts were made by TFI staff to contact Father to schedule another visit, but Father never provided his availability. Because he never arranged to meet with TFI, an action plan was never completed. In fact, TFI lost all contact with Father from May 2023 to February 2025. During that time Father not only had no contact with TFI, but more telling, he had no contact with J.S., not even a letter.

Father did not attend the permanency hearing in September 2024 and, not surprisingly, the district court found reintegration was no longer a viable goal. The court shifted the case plan goal towards adoption of J.S.

On February 18, 2025, TFI contacted J.S.'s paternal grandmother, and learned for the first time that Father was incarcerated at Sedgwick County Jail. The following day, on February 19, Debler held a conference call with Father in which he stated that his incarceration was for at least six more months. Father acknowledged he had been incarcerated most of J.S.'s life but did not wish to relinquish his rights.

The district court held a hearing on the subsequently filed motion to terminate parental rights on April 29, 2025. Three witnesses provided testimony: Father and two TFI employees, Vienna Rose and Debler.

Rose explained that J.S. could not return home to Father due to the lack of stable housing and the fact that Father had not completed any case plan tasks. Debler spoke of

3

Father's total lack of contact with TFI. She informed the court that Father would not provide an address or phone number and eventually stopped responding to messages on Facebook.

Father testified and confirmed he was incarcerated and that he had 19 more months on his sentence to serve. After his release, Father planned to reside with his girlfriend and his other son. Father testified that with the exception of one month when he was out on bond, he was incarcerated throughout the case. Father confirmed he has never met J.S.

Father claimed that he never knew about any case plan and that he was never given case plan tasks to complete. Father confirmed that TFI contacted him about visitation and required him to sign papers and complete a drug test, but he never signed the papers. Father explained that on the day he was scheduled to meet with TFI, he had to work and contacted TFI only minutes *before* the meeting. He denied TFI staff had ever contacted him, except the initial custody notice, a paternity testing letter, and contact regarding the termination of parental rights.

In closing, the State asserted that Father's parental rights should be terminated because contact had been minimal since paternity was established, Father currently had no stable housing of any kind, and he had failed to work on any kind of case plan. The court-appointed guardian ad litem, likewise, recommended terminating parental rights due to the lack of Father's participation or progress in the case plan, noting that Father's only reason for not participating was his own continued doubts regarding his paternity. He continued to express those doubts at the hearing despite the paternity test listing him as J.S.'s father.

Father's counsel requested that the district court not terminate Father's parental rights, arguing that the sole basis for termination was incarceration and that incarceration alone cannot justify severing parental rights.

The district court made extensive findings of fact to support its ultimate conclusion of unfitness. The court found that Father failed to rebut the statutory presumptions of unfitness and concluded "it is in the best interest of [J.S.] that the parental rights of his natural father, [Father], be terminated as he is an unfit parent." Those findings will be examined in more detail below.

Father timely appeals.

ANALYSIS

A parent has a fundamental constitutional right to a parental relationship with his or her child protected by the Kansas and United States Constitutions. *In re K.W.D.*, 321 Kan. 100, 109, 573 P.3d 221 (2025). But a parent may lose his right to a parental relationship with his child "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). That is exactly what the district court concluded here.

In reviewing a district court's termination of parental rights, we view all evidence in the light most favorable to the prevailing party (here the State) to determine whether a rational factfinder could have found it highly probable by clear and convincing evidence that parental rights should be terminated. *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, we do not "weigh conflicting evidence, pass

5

on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Kansas statutes allow a court to presume a parent is unfit if clear and convincing evidence supports certain findings, which will be detailed as it relates to each presumption recognized here. Once a presumption is properly invoked, the burden shifts to the parent to rebut the presumption by a preponderance of the evidence. "In the absence of proof that the parent is presently fit and able to care for the child or that the parent will be fit and able to care for the child in the foreseeable future, the court shall terminate" the parent's parental rights. K.S.A. 38-2271(b).

The district court invoked two presumptions of unfitness here, shifting the burden of proof to Father. Father appeals the court's invocation of these presumptions and the sufficiency of the evidence to support them. He does not claim he submitted any evidence to rebut the presumptions, only that they were improperly invoked. Although the evidence for each presumption is somewhat duplicative, we will address each in turn. If there is sufficient evidence to support the presumptions, we will proceed to determine whether Father's unfitness will continue in the foreseeable future and whether it is in J.S.'s best interests that Father's rights be terminated.

1.      *The district court did not err in finding clear and convincing evidence supported the presumption of unfitness of Father under K.S.A. 38-2271(a)(5).*

Here, when terminating Father's parental rights, the district court found Father presumptively unfit under K.S.A. 38-2271(a)(5), which applies if the State proves by clear and convincing evidence:

> "[T]he child has been in an out-of-home placement, under court order for a
> cumulative total period of one year or longer and the parent has substantially neglected or

willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home."

The district court found:

"The State by clear and convincing evidence, established that father was provided a reasonable plan, that was approved by the court, to reintegrate the child into his home, but father has substantially or willfully refused to complete the plan and as a result the child has been out of the home for a period of more than one year, and therefore father is presumed to be unfit under K.S.A. 38-2271(a)(5) and K.S.A. 60-414(a)."

Father argues that the reason he was unable to complete a reintegration plan was because he was incarcerated the entire time the case was pending except for approximately one month. As a result, he states that he was unaware of any case task plans. Father further argues that TFI's failure to locate Father and its lack of communication with him made it impossible for him to be aware of and complete his case plan tasks.

Of course at the foundation of Father's argument is that he must have had a real-world opportunity to take on his obligation under the circumstances presented. See *In re Adoption of Baby Girl P.*, 291 Kan. 424, 433, 242 P.3d 1168 (2010) ("The preservation of a father's relationship with his child is the starting point of a termination proceeding, not the finish line that a father must labor to reach.").

Father argues that he was unable to complete the reintegration plan largely because of his incarceration which in turn left him unaware of his case plan tasks. When TFI personnel did find Father, he argues that TFI did not make meaningful efforts to work on a case plan with him. The evidence belies Father's claims.

7

A. *Time in DCF Custody*

There is no dispute that J.S. has been in DCF custody for more than one year. J.S. had been in custody since 2022, and he was still in DCF custody as of June 2025. Even taking into account that Father's paternity was not established until 2023, J.S. has still been in DCF custody for more than one year.

B. *Substantially neglected or willfully refused to carry out a reasonable court ordered reintegration plan*

Father's paternity was established in 2023. A meeting was immediately set up in May 2023 for Father to sign the necessary paperwork to obtain drug testing, to establish a reintegration plan, and to visit his son for the first time. Although Father was incarcerated for nearly the entire case, including at the termination hearing, he was not incarcerated in May 2023. Nevertheless, he did not show up. The record explicitly shows that TFI asked him and his girlfriend to begin submitting U.A.s. They did not. Accordingly, Father was informed of and aware of his very first case plan requirements toward reunification, yet he never completed them. In fact, he failed to respond to repeated attempts by TFI personnel to contact him. Father initially provided a phone number, although he would not respond to repeated attempts to contact him at the number provided. He also contacted TFI personnel through Facebook messages but did not follow through with their responses or direction. Eventually, he stopped responding at all. This cat and mouse game continued until contact was reestablished 21 months later through some sleuthing on the part of TFI personnel, locating him in jail.

As a practical matter, incarcerated individuals may face significant barriers to fulfill the customary parental duties, yet Father has not claimed that anything prevented him from contacting TFI. Father was initially notified of TFI's contact information, as well as his attorney's information. It was apparent that Father maintained contact with his

girlfriend and mother at times. Father could have asked them to relay his location, provide him with contact information, or have them ask TFI to reach him in jail, particularly if he was interested in the future care for his child and reintegration upon release. He did none of those things. The lack of a detailed reintegration plan was due to Father's failure to maintain contact with TFI. TFI made reasonable attempts to engage Father in his child's present and future care, to no avail.

And more importantly, Father made no attempt to contact J.S. to establish a relationship. Nor did he try to comply with any requests he could comply with while in prison. As his attorney noted at the termination hearing, "TFI can work with a parent while they're incarcerated to complete parenting classes, do mental health evaluations, drug and alcohol evaluations, all of that stuff can be completed while the parent is incarcerated. There was no effort for that to occur in this case." Instead his explanation for not reaching out to TFI was "I'm in jail, ain't much I can do." Even though staff had no idea he was in jail, Father placed all the blame at the feet of TFI for not arranging those services in jail. Yet Father did nothing to respond to TFI personnel's repeated requests to discuss his case. He did not do the most basic task, communicate with those who controlled whether he could reintegrate with the son he never met. He failed to relay any real plan to care for his child after his incarceration or how he would address the trauma that may be inflicted on J.S., who would be approximately five years old by the time reintegration could occur—having never lived with or even known Father.

The evidence was clear and convincing that Father's conduct constitutes substantial and willful refusal to complete any reintegration plan. The record therefore supports the district court's ultimate finding that the State proved by clear and convincing evidence that J.S. was in out-of-home placement under court order for a cumulative total period of one year or longer and Father substantially neglected or willfully refused to comply with a reasonable, court-approved reintegration plan. Accordingly, the district

9

court did not err in relying on the presumption of unfitness under K.S.A. 38-2271(a)(5) finding Father unfit when terminating Father's parental rights.

2.      *The district court did not err in finding clear and convincing evidence to support the presumption of father's unfitness under K.S.A. 38-2271(a)(6).*

The district court also found Father presumptively unfit under K.S.A. 38-2271(a)(6), which applies if the State proves by clear and convincing evidence:

> "(A) [T]he child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future."

The district court found:

> "The State by clear and convincing evidence, established that father has been given 30 months to attempt to alter his position and reintegrate the child and failed to make reasonable efforts to do so and there is a substantial probability that the parent will not carry out such plan in the near future and therefore is presumed to be unfit under K.S.A. 38-2271(a)(6) and K.S.A. 60-414(a)."

Father again argues that he was unable to complete the reintegration plan largely because of his incarceration which in turn left him unaware of his case plan tasks. His argument mirrors the one previously discussed. When TFI did find Father, he argued that TFI did not make meaningful efforts to work on a case plan with him. Again, the evidence is contrary to Father's position.

A. *Time in DCF Custody*

Father does not deny that J.S. has been in out-of-home placement by court order for a cumulative total period of two years or longer. Instead, he contends that his lack of progress before paternity was established should not be considered in the application of the K.S.A. 38-2271(a)(6) presumption because before paternity was confirmed, he was not legally recognized as a "parent," and thus had no obligation to care for J.S.

That said, the Kansas Legislature intended to include alleged, nonpresumptive fathers within the meaning of "'parent'" under the Kansas Code for Care of Children. *In re A.N.P.*, 23 Kan. App. 2d 686, 689, 934 P.2d 995 (1997). Father was notified that he was the presumed father of J.S. when J.S. was initially placed into DCF custody on October 12, 2022. Although Father's questioning of paternity and request for confirmation may have been reasonable, his own incarceration likely delayed the testing process and, in turn, postponed his participation in the case. Still, Father was confirmed as J.S.'s father on April 26, 2023, and the termination hearing was held just over two years later, on April 29, 2025.

Thus, the record contains clear and convincing evidence that J.S. was in out-of-home placement for over two years, satisfying K.S.A. 38-2271(a)(6)(A).

B. *Failure to carry out a reasonable, court-approved reintegration plan*

Regarding K.S.A. 38-2271(a)(6)(B)—whether Father substantially neglected or willfully refused to carry out a reasonable, court-approved reintegration plan—as earlier discussed, Father contends that without knowing what the reasonable plan was, it was impossible for him to carry it out during the pendency of the case, or in the future. But as already noted, there were ample opportunities for Father to communicate with TFI personnel regarding their requirements and to start any case plan tasks, but Father failed

11

to return their phone calls or engage in any way to establish those tasks. These tasks are not developed in a vacuum.

Father cannot appear sporadically, go silent when responsiveness was required, and then blame TFI for failing to exert greater effort to keep him engaged. TFI had no ability to corral Father, force him to care, or compel him to prioritize his child. Yet, Father had the ability to contact TFI and inform it of his incarceration, contact his attorney for guidance, or work through family members whom he had used as intermediaries in the past. Even after contact was reestablished in February 2025, the record shows that Father refused at least one call from TFI. This pattern demonstrates that the lack of progress resulted from Father's own choices and level of commitment, not from any failure by TFI.

C. *The probability that Father will not carry out a reintegration plan in the near future*

Finally, regarding K.S.A. 38-2271(a)(6)(C), the district court found that there is a substantial probability that Father will not carry out the reintegration plan in the near future.

Father relies on *In re T.H.*, 60 Kan. App. 536, 548, 494 P.3d 851 (2021), for the proposition that "incarceration does not necessarily result in an automatic and exclusive basis for an unfitness finding." Instead, "[i]ncarceration can be a mitigating or a negative factor in the parent's continued ability to parent their child." 60 Kan. App. 2d at 548.

Here, however, incarceration was not an automatic and exclusive basis for the district court's finding. Here it is clearly a mitigating and negative factor in Father's ability to parent J.S. First, as stated previously, any failure to receive a case plan stemmed from Father's lack of consistent communication, a problem compounded—but not

12

caused—by his incarceration. Notably, Father continued to have run-ins with the law, incurring eight charges during the pendency of this case, which likely hindered his ability to focus on reintegration efforts.

Second, Father's circumstances differ significantly from those in *In re T.H.* T.H.'s father had DCF-approved custody of his son prior to his incarceration, and T.H. was thriving in his care. Before incarceration, T.H.'s father consistently provided for T.H. and safeguarded him, including removing him from the mother's care after she injured him. While serving a prison sentence, his father arranged for T.H. to stay with a trusted family friend, provided financial support, and maintained regular contact. T.H.'s father also had a job and home awaiting his release. Under those circumstances the finding of T.H.'s father being unfit was not supported by clear and convincing evidence and the district court's decision that it was in T.H.'s best interests to have his father's parental rights terminated was unreasonable. 60 Kan. App. 2d at 536-37.

Here, Father had no relationship with J.S. before incarceration. Father did nothing to seek out or cultivate any sort of relationship with J.S., and unlike T.H.'s father who had regular contact with his son from prison, Father had no contact with J.S. He did not even send a single letter. Father has never met J.S., communicated with J.S., and as explained in the previous analysis, he has made no meaningful efforts to contact J.S. since paternity was established in 2023. There is no familial relationship to reintegrate because Father has done nothing to establish such a relationship. Father made no effort to show that he would provide for J.S. physically, emotionally, or financially. He does not claim to have had an established caregiver to care for J.S. in his absence. Instead, he became incarcerated again, showing a lack of effort to adjust his conduct and circumstances to best support the needs of J.S. In fact, at the hearing he continued to question paternity in spite of evidence to the contrary.

When reviewing the record in the light most favorable to the State, the evidence supports the district court's finding that the State established by clear and convincing evidence that J.S. was in out-of-home placement under court order for a cumulative total period of two years or longer. Additionally, during this time, Father had the opportunity to carry out a reasonable court-approved reintegration plan, yet he has failed to do so and there is substantial probability that he would not carry out such plan in the near future. Father fails to rebut the presumption. Thus, the district court did not err in finding Father presumptively unfit under K.S.A. 38-2271(a)(6) when it terminated Father's parental rights.

3.    *The evidence supports the court's finding that Father's conduct is not likely to change in the foreseeable future.*

When determining whether a parent's conduct is likely to change in the foreseeable future, the court considers the foreseeable future from the child's perspective because children experience time differently than adults. K.S.A. 38-2201(b)(4); *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014). A month or a year seems considerably longer for a child than it would for an adult. *In re K.W.D.*, 321 Kan. at 112-13. Children have a right to permanency within a time frame reasonable to them. 321 Kan. at 113.

By the time of the termination hearing, two years had already passed during which J.S. had never met Father. It would be an additional 19 months before reintegration, which would initially be limited to supervised visits, could even begin. This is an unreasonably long delay for J.S. to obtain permanency. See *In re M.H.*, 50 Kan. App. 2d 1162, 1172, 1176, 337 P.3d 711 (2014) (father incarcerated for majority of child's life, evidence of significant impact on relationship with child, neglected to attend case plan meetings by phone, had many disciplinary violations in prison further delaying his release, had spent as little as one day with child before child put in DCF custody). J.S. has never met Father. Father has failed to do anything to outline a plan to reintegrate with

14

the son he has never met after his incarceration. He fails to acknowledge any trauma that may be inflicted on J.S., who will then be approximately five years old—having never lived with or even known Father. Father failed to initiate contact with J.S. even after contact was reestablished with TFI. "'A . . . court may look to a parent's past conduct as an indicator of future behavior' and give weight to actions over intentions. [Citations omitted.]" *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024). The district court did not err in finding Father's conduct was unlikely to change in the foreseeable future.

4.  *A preponderance of the evidence supports the district court's finding that it was in J.S.'s best interests to terminate Father's parental rights.*

In deciding whether termination of parental rights is in the best interests of the child, the court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 38-2269(g)(1). At this stage, the issue is not whether the parent's rights can be terminated, the issue is whether the parent's rights should be terminated. *In re K.W.D.*, 321 Kan. at 116.

The child's best interests finding must be supported by a preponderance of evidence and is reviewed for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1115-16. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re A.S.*, 319 Kan. 396, 400, 555 P.3d 732 (2024).

Father does not claim that the district court abused its discretion in finding that termination was in J.S.'s best interests. His sole argument is that there was insufficient evidence to support imposition of the presumptions of unfitness due to a failure on the part of TFI. But it is clear that the district court did not commit an error of law, or fact, nor was its decision unreasonable. J.S.'s Mother relinquished her parental rights, after finding it difficult to care for J.S. and the new baby she had in late 2023. She had been

15

complying with reintegration plans, but decided it was in J.S.'s best interests to be adopted by his foster family. At the same time, Father had no contact with J.S. and still did not seem convinced he was J.S.'s father. At the time of termination, J.S. was thriving with his foster family, who were an adoptive resource. He called his foster mother "'mommy'" and was a well-adjusted, healthy child.

We find the district court did not abuse its discretion in finding that it was in J.S.'s best interests that Father's parental rights be terminated.

Affirmed.